This Opinion is a
Precedent of the TTAB

Mailed: May 29, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE
————

Trademark Trial and Appeal Board
————

*New Era Cap Co., Inc.*
*v.*
*Pro Era, LLC*
————

Opposition No. 91216455
————

Michael J. Berchou and Kimberly I. Shimomura of Harter Secrest & Emery LLP
    for New Era Cap Co., Inc.

Evita G. Kaigler of the Law Offices of Evita G. Kaigler LLC
    for Pro Era, LLC.

————

Before Bergsman, Lykos and Larkin,
    Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

On August 23, 2012, Pro Era, LLC ("Applicant") filed an application to register on the Principal Register the standard character mark PRO ERA for goods and services ultimately identified as,

> Clothing, namely, shirts, long-sleeved shirts, T-shirts, under shirts, night shirts, rugby shirts, polo shirts, cardigans, jerseys, uniforms, scrubs not for medical purposes, smocks, dress shirts, bottoms, pants, jeans, culottes, cargo pants stretch pants, denim jeans, overalls, coveralls, jumpers, jump suits, shorts, boxer shorts, tops, stretch tops, tube tops, crop tops, tank tops, tankinis,

halter tops, sweat shirts, hooded sweat shirts, sweat jackets, sweat shorts, sweat pants, wraps, warm-up suits, jogging suits, track suits, track pants, play suits, blouses, skirts, dresses, gowns, sweaters, vests, fleece vests, pullovers, snow suits, parkas, capes, anoraks, ponchos, cloaks, shrugs, shawls, pashminas, jackets, reversible jackets, wind-resistant jackets, shell jackets, sports jackets, golf and ski jackets, jean jackets, coats, heavy coats, over coats, petticoats, blazers, suits, tuxedos, cummerbunds, cuffs, collars, removable collars, collar protectors, turtlenecks, cloth ski bibs, swimwear, beachwear, tennis wear, surf wear, ski wear, layettes, infantwear, infants sleepers, booties, baby bibs not of paper, caps, hats, visors, headbands, wrist bands, sweat bands, headwear, ear muffs, aprons, scarves, bandanas, belts, suspenders, neckwear, ties, neckerchiefs, pocket squares, ascots, singlets, socks, leg warmers, hosiery, leggings, tights, leotards, body suits, unitards, loungewear, robes, underwear, thermal underwear, long underwear, briefs, bras, sports bras, thongs, G-strings, foundation garments, underclothes, pajamas, sleepwear, lingerie, slips, sarongs, gloves, mittens, rain slickers, rainwear, footwear, shoes, mules, sneakers, boots, galoshes, sandals, flip-flops, and slippers in International Class 25; and

Entertainment in the nature of visual and audio performances by musical artists; Entertainment services by a musical artist and producer, namely, musical composition for others and production of musical sound recordings; Entertainment services in the nature of live musical performances; Entertainment services in the nature of presenting live musical performances; Entertainment services in the nature of recording, production and post-production services in the field of music; Entertainment services, namely, non-downloadable ringtones, pre-recorded music, and graphics presented to mobile communications devices via a global computer network and wireless networks; Entertainment, namely, live music concerts; Entertainment, namely, live performances by musical bands; Live performances by a musical group; Music production services; Music video production; Planning arrangement of showing movies, shows, plays or musical performances; Presentation of musical performance; Production of musical sound recording; Production of musical videos; Production of

sound and music video recordings; Providing a website featuring information in the field of music and entertainment in International Class 41.[1]

New Era Cap Co., Inc. ("Opposer") opposes registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), as to the International Class 25 goods only, on the ground of likelihood of confusion based on Opposer's previously used and registered NEW ERA marks and alleged family of ERA marks.[2] In the Notice of Opposition, Opposer pleaded ownership of numerous registrations, including the following:

Registration No. 2031348 for the mark displayed below



---

[1] Application Serial No. 85711680, filed under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), claiming a bona fide intent to use the mark in commerce for the International Class 25 goods, and under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use of its mark anywhere as of January 1, 2011, and first use in commerce as of January 1, 2012, for the International Class 41 services. The mark appears on the drawing page as "Pro Era" but this does not change the nature of the mark from standard characters to special form. *See In re Calphalon Corp.*, 122 USPQ2d 1153 n.1 (TTAB 2017) (citing *In re Star Belly Stitcher, Inc.*, 107 USPQ2d 2059 n.1 (TTAB 2013)). Our reference to the mark in all uppercase letters reflects the fact that an applied-for term in standard character form is not limited to any particular font style, size, or color. *See* Trademark Rule 2.52, 37 C.F.R. § 2.52.

Citations to the record throughout the decision include references to TTABVUE, the Board's online docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry. *See, e.g., Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Portions of the record have been designated confidential. With a few exceptions, the citations to the record refer to the redacted, publicly available versions of each submission.

[2] The operative complaint is Opposer's Third Amended Notice of Opposition filed November 8, 2016. *See* 34 and 35 TTABVUE (Opposer's Motion to Amend and Board order granting the motion).

on the Principal Register for "athletic caps" in International Class 25;[3]

Registration No. 2584973 for the mark NEW ERA (typed form)[4] on the Principal Register for "athletic caps" in International Class 25;[5]

Registration No. 3759352 for the standard character mark NEW ERA on the Principal Register for "metal money clips" in International Class 6; "sunglasses" in International Class 9; "Luggage, handbags, backpacks, and wallets" in International Class 18; and "Clothing for men, women and children, namely, t-shirts, sweatshirts, sweatsuits; outerwear, namely, baseball jackets, coats, pants, shorts, jeans, shirts" in International Class 25;[6]

Registration No. 4396437 for the standard character mark NEW ERA on the Principal Register for "Footwear for men, women and children" in International Class 25;[7]

Registration No. 3811674 for the mark displayed below on the Principal Register



for "Headwear, athletic apparel, namely, hats and caps, baseball caps and hats" in International Class 25;[8]

Registration No. 4380794 for the standard character mark DRYERA on the Principal Register for "Headwear, hats,

---

[3] Registered January 21, 1997; renewed.

[4] Prior to November 2, 2003, "standard character" drawings were known as "typed" drawings; the preferred nomenclature was changed to conform to the Madrid Protocol. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012); *see also* TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 807.03(i) (Oct. 2018).

[5] Registered June 25, 2002; renewed.

[6] Registered March 9, 2010; renewed.

[7] Registered September 3, 2013; combined Section 8 and 15 declaration accepted and acknowledged.

[8] Registered June 29, 2010; renewed. The mark consists of the letters "NE" in the shape of a flag next to the words "NEW ERA". Color is not claimed as a feature of the mark.

caps, knit hats, and baseball caps" in International Class 25;[9]

Registration No. 4380795 for the standard character mark COOLERA on the Principal Register for "Headwear, hats, caps, knit hats and baseball caps" in International Class 25;[10]

Registration No. 4380796 for the standard character mark SOLARERA on the Principal Register for "Headwear, hats, caps, knit hats and baseball caps" in International Class 25;[11]

Registration No. 4380816 for the standard character mark WINTERERA on the Principal Register for "Headwear, hats, caps, knit hats and baseball caps" in International Class 25;[12]

Registration No. 4456418 for the standard character mark DIAMOND ERA on the Principal Register for "Headwear, hats, caps, knit hats and baseball caps" in International Class 25;[13] and

Registration No. 4633210 for the standard character mark MICROERA on the Principal Register for "Headwear, hats, caps, knit hats and baseball caps" in International Class 25.[14]

---

[9] Registered August 6, 2013; combined Section 8 and 15 declaration accepted and acknowledged.

[10] Registered August 6, 2013; combined Section 8 and 15 declaration accepted and acknowledged.

[11] Registered August 6, 2013; combined Section 8 and 15 declaration accepted and acknowledged.

[12] Registered August 6, 2013; October 4, 2016; combined Section 8 and 15 declaration accepted and acknowledged.

[13] Registered December 24, 2013; combined Section 8 and 15 declaration accepted and acknowledged.

[14] Registered November 4, 2014; combined Section 8 and 15 declaration accepted and acknowledged.

In its Answer, Applicant admitted that U.S. Patent and Trademark Office ("USPTO") records indicate that Opposer is the owner of its pleaded registered marks; otherwise, Applicant denied the salient allegations of the Notice of Opposition. *See* Answer to Third Amended Notice of Opposition ¶¶ 3 and 5; 36 TTABVUE 2-4.

The case is fully briefed. Opposer, as plaintiff in this proceeding, bears the burden of establishing its standing and Section 2(d) claim by a preponderance of the evidence. *See Jansen Enters. Inc. v. Rind*, 85 USPQ2d 1104, 1107 (TTAB 2007).

I. The Parties' Stipulation

During the interlocutory phase of this case, the parties entered into the following stipulation regarding the admissibility and authenticity of evidence submitted during trial:

> All documents produced by either party in this Opposition proceeding shall be deemed authentic and admissible for trial. Either party may submit any such documents as evidence of record in this Opposition by Notice of Reliance and rely on such documents at trial.
>
> All discovery deposition testimony, responses to interrogatories, and responses to requests for admissions from either party in this Opposition shall be deemed admissible for trial. Either party may submit such documents as evidence of record in this Opposition by Notice of Reliance and rely on them at trial.
>
> Notwithstanding the foregoing, the Parties reserve the right to object to any evidence on the ground of accuracy, completeness, relevance, materiality, weight and competence.

"Stipulation of Admissibility and Authenticity of Evidence" ¶¶ 1-3, filed August 27, 2018 at 42 TTABVUE. The Board commends the parties for utilizing this time- and cost-saving mechanism.

II. The Record

The record includes the pleadings, and pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Applicant's application file. Opposer introduced the testimony declarations of David Heimburg, Opposer's Vice President & General Manager, North America[15] with Exhibits A-E (50 TTABVUE – public; 51 TTABVUE – confidential) and Eddie Capobianco, Opposer's Entertainment Marketing Manager (52 TTABVUE). Opposer also submitted notices of reliance during both its main (49 TTABVUE – confidential; 53, 54 & 55 TTABVUE – public) and rebuttal (71 TTABVUE) testimony periods. Applicant submitted the testimony declarations of Kimbah Virgine, a member of Applicant and Applicant's Chief Financial Officer (66 TTABVUE) and Jo-Vaughn Virgine, owner and member (67 TTABVUE) as well as a notice of reliance (68, 69 & 70 TTABVUE).

III. The Parties

A. Opposer

Opposer was founded in 1920 in Buffalo, New York, and began its relationship with professional baseball in 1934 by becoming the on-field cap provider for the Cleveland Indians. Heimburg Decl. ¶¶ 5 and 23; 50 TTABVUE 4 and 9. By 1993, Opposer's NEW ERA branded caps had become the official cap of every major league baseball ("MLB") team. *Id.* at ¶ 23; 50 TTABVUE 9. Opposer advertises the NEW

---

[15] Mr. Heimburg has served in his current position with Opposer since March 2015. He has also served in other positions, including Managing Director, 5th & Ocean Clothing (May 2012 through March 2015), Customer Service Director (June 2006 through April 2012), and Plant Manager (September 2003 through June 2006). Heimburg Decl. ¶ 1; 50 TTABVUE 3.

ERA brand "by displaying it in most MLB baseball dugouts and behind home plate, such that it is visible throughout thousands of national, regional and local television broadcasts every year – reminding fans of Opposer's partnership with and support of MLB." *Id*. at ¶ 23; 50 TTABVUE 9. Opposer also designates as "brand ambassadors" individual professional baseball players, including Bryce Harper, at the time of trial a member of the Washington Nationals, Jose Altuve of the Houston Astros, and Mookie Betts of the Boston Red Sox. *Id*. at ¶ 24; 50 TTABVUE 9-10.

In addition to major league baseball, Opposer has a strong presence in professional football by providing the "official on-field caps of the [National Football League] NFL" beginning in 2012 and by acquiring the naming rights to the Buffalo Bills stadium which is now known as "New Era Field." *Id*. at ¶ 26; 50 TTABVUE 10. Opposer's NFL player "brand ambassadors" include Dak Prescott of the Dallas Cowboys, Le'Veon Bell formerly of the Pittsburgh Steelers, and Khalil Mack formerly of the Oakland Raiders. *Id*. Since 2012, Opposer has also been providing the official caps for the Super Bowl and participating in Super Bowl festivities, hosting a "style lounge" and various parties for athletes, celebrities, and business executives and providing player-exclusive caps to the participating players. *Id*. at ¶ 28; 50 TTABVUE 11. Opposer's activities at Super Bowl XLIX gained the NEW ERA brand over 550 million "social media impressions" (i.e. "an instance of the target content being delivered to a user's feed") as well as unsolicited third-party media attention from MAXIM, "Entertainment Tonight, E!," USA TODAY, SPORTS ILLUSTRATED, "The Today Show," Sirius XM Radio. *Id*. at ¶ 28 n.1; 50 TTABVUE 11.

Opposer partners with not only professional baseball and football players as brand ambassadors but also with athletes in other sports such as professional basketball, professional golf, the U.S. Olympic Ski Team, the North American Soccer League, Little League Baseball, and NASCAR. *Id.* at ¶¶ 21, 27, and 29; 50 TTABVUE 9, 11-12. Opposer is the exclusive cap provider for the NBA Draft, NBA Finals and Conference Finals, and the G-League, WNBA, and the U.S. Olympic Ski Team *Id.* at ¶19(d); 50 TTABVUE 8-9.

Opposer advertises at every professional baseball stadium throughout the United States and virtually every major, minor, and junior sporting events, as well as major sporting events such as the World Series, Super Bowl, NBA Championship, NHL Stanley Cup, the MLB, NBA and NHL All-Star Games, NASCAR races, Indy Car races and related championships, and thousands of others. *Id.* at ¶ 19(a) and (e); 50 TTABVUE 7-8. Opposer sells merchandise through every team concessionaire for all NFL, NBA and MLB teams, and has NEW ERA advertising and NEW ERA-branded shelving in every sports stadium for MLB, NBA, NFL, and Minor League Baseball *Id.* at ¶19(e); 50 TTABVUE 8.

For "almost 10 years," Opposer has expanded into clothing and accessories under the NEW ERA brand. *Id.* at ¶ 10; 50 TTABVUE 5. In addition to professional sports, Opposer collaborates with musicians and artists to create custom clothing and cap collections and sponsor performances at music festivals such as Coachella, SXSW and Lollapalooza and awards ceremonies such as the Grammys. *Id.* at ¶¶ 8, 9; 50 TTABVUE 4-5 and Capobianco Decl. ¶ 6; 52 TTABVUE 6. Some of these artists and

musicians include Spike Lee, hip hop artist MF Doom, Kesha, Pearl Jam, John Mayer and Chance the Rapper. *Id.*

Opposer also advertises its products online, including Opposer's business-to-consumer (B2C) website at neweracap.com, popup and banner advertising on third-party websites, and social media accounts on Twitter, Instagram, Pinterest, and Facebook. Heimburg Decl. ¶ 19(h); 50 TTABVUE 8. Over 3.5 million users have liked Opposer's Facebook page. *Id.* Opposer has over 204,000 followers on Twitter and more than 710,000 followers on Instagram, and New Era's You Tube Channel has over 37,000 subscribers. *Id.* Opposer also advertises via in-store displays at both New Era's stores and third-party retail stores such as Champs Sports, Foot Locker, and Lids. *Id.* at ¶ 19(i); 50 TTABVUE 9.

### B. Applicant

Applicant is a hip-hop band and collective which was founded in 2010. Kimbah Virgine Decl. ¶ 5; 66 TTABVUE 4. A hip hop collective is a group of individual artists who serve as both an individual artist and a member of a group. *Id.* at ¶ 6; 66 TTABVUE 5. There are currently seven artist-affiliates in Applicant's hip-hop collective. *Id.* at ¶ 7; 66 TTABVUE 5. Applicant chose the name "Pro Era" as an abbreviation for "Progressive Era," Applicant's official name. *Id.* at ¶ 4; 66 TTABVUE 3.

Since its inception, Applicant has released 23 music projects on its website www.theproera.com/music. Jo-Vaughn Virgine Decl. ¶ 4; 67 TTABVUE 3. Applicant's SoundCloud page (https://soundcloud.com/proeraradio) contains 264 individual music tracks, and currently has 1.79 million subscriptions. *Id.* at ¶¶ 5 and 6; 67

TTABVUE 4. Applicant's YouTube channel/page has 209 music videos; 654,000 subscribers; and a combined 273,065,711 total music video views. *Id.* at ¶¶ 7 and 8; 67 TTABVUE 4.

Applicant garners revenue from album sales, tours, endorsements, private events, concerts, television and movie appearances, and merchandise sales. Kimbah Virgine Decl. ¶ 8; 66 TTABVUE 4. Applicant expanded its merchandise revenue stream to clothing "because of touring and its fans," selling apparel at concerts and on its website (www.theproera.com), on www.shopify.com and on a variety of social media platforms, including Twitter, Facebook, and Instagram. *Id.* at ¶¶ 9-12; 66 TTABVUE 4.

### C. The Parties' Prior Dealings

Jo-Vaughn Virgine, Applicant's owner and founding member, testified that Opposer approached Applicant to participate in a series of personal appearances and performances for an MLB All Star Campaign, but that once Opposer learned of Applicant's pending trademark application, Opposer notified Applicant that it would not move forward with the proposed collaboration unless Applicant expressly abandoned International Class 25 of the subject application. Jo-Vaughn Virgine Decl. ¶¶ 14-18; 67 TTABVUE 4-5. Eddie Capobianco, Opposer's Entertainment Marketing Manager, testified that when negotiations between the two parties initially commenced, Opposer was without knowledge of Applicant's PRO ERA trademark application for International Class 25 goods (Capobianco Decl. ¶ 15), but once it had learned that Applicant had filed an application to register PRO ERA in International Class 25, Opposer ceased all efforts to enter into a collaboration with Applicant. *Id.*

at ¶¶ 15-18; 52 TTABVUE 12.[16]

IV. Standing

Standing is a threshold issue that must be proven by the plaintiff in every inter partes case. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1401 (2015); *John W. Carson Found. v. Toilets.com Inc.*, 94 USPQ2d 1942, 1945 (TTAB 2010). Opposer must prove its standing by showing a real interest in the outcome of the proceeding and a reasonable basis for believing that it would suffer damage if the mark is registered. *See* 15 U.S.C. § 1063; *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 111 USPQ2d at 1062. A "real interest" is a "direct and personal stake" in the outcome of the proceeding. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1026 (Fed. Cir. 1999).

Opposer has demonstrated through the USPTO database printouts made of record under notice of reliance that it is the owner of its pleaded registrations comprised of the term ERA for various apparel items and that the registrations are valid and subsisting. Opposer's Notice of Reliance, Exhibits A-1 to A-19; 53 TTABVUE 3-156. Because Opposer's registrations are of record, Opposer has established its standing to bring a Section 2(d) claim that is not wholly without merit. *See Lipton Indus. Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

---

[16] To the extent, if any, that Applicant argues or implies that Opposer, based on this prior history, acted in bad faith in bringing this opposition, we disagree.

V. Section 2(d) Claim

We turn now to the substantive claim before us. Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), prohibits the registration of a mark that

> [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

A. Opposer's Alleged Family of Marks

In the Notice of Opposition, Opposer alleges that it owns a family of ERA formative marks based on Opposer's "effort and investment … in advertising, promotion, and sales" and use of marks with different prefixes, such as DRYERA, COOLERA, SOLARERA, WINTERERA, DIAMOND ERA, and MICROERA in connection with "headwear, hats, caps, knit hats, and baseball caps" prior to Applicant's August 23, 2012 filing date. Third Amended Notice of Opposition ¶ 5; 34 TTABVUE 6.[17] Proof of a family of marks could be relevant in a likelihood of confusion dispute in at least one of two ways. First, as the seminal *du Pont* decision suggests by mentioning it in the ninth *DuPont* factor, which talks about the "variety of goods," it could affect the analysis of the similarity of goods. *See In re E. I. du Pont de*

---

[17] In its brief, Opposer does not directly address the family of marks issue but refers to its "NEW ERA and ERA family of marks" throughout as if this is an established fact. *See, e.g.*, Opposer's Appeal Brief, pp. 3, 20, and 30; 77 TTABVUE 9, 20, and 36. And in its reply brief, Opposer states that "Applicant does not contest that New Era owns and promotes a widely known family of marks including NEW ERA, DRYERA, COOLERA, SOLARERA, WINTERERA, DIAMOND ERA and MICROERA, or that New Era's marks are inherently distinctive." Reply Brief, 80 TTABVUE 7. In this particular case, we do not construe Applicant's silence on this issue as an admission.

*Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("(9) The variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)".).

Where a senior user employs a family of marks on a range of products, a junior user with a mark that has the family characteristic is less able to argue that the difference in the goods has significant weight, because consumers are accustomed to seeing the "family" on a range of goods. Second, in a case like the present where the family comprises a common suffix (or prefix) in marks, or a single term in multiple-term marks, a junior user/applicant may find it harder to argue that the difference in the "non-family" part of its mark weighs against confusion, because consumers are accustomed to seeing the family component together with another element coming from one source (the senior user).

Opposer's reliance on a family of –ERA marks also presents a preliminary issue we must resolve before assessing likelihood of confusion. The reason we must resolve it first is that one of the issues in an opposition is priority. Where an opposer relies on a registration, the priority issue is obviated by ownership of the registration. *See King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). *See also Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1727-28 (Fed. Cir. 2012). Although the USPTO may register several individual marks comprising a family element together with one or more other elements, it does not register "families" of prefixes, suffixes, or other components of a mark. Thus, an opposer relying on a family of marks is relying on common law rights in the alleged family.

The seminal case defining a family of marks is *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891-92 (Fed. Cir. 1991):

> A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner. Simply using a series of similar marks does not of itself establish the existence of a family. There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods…. Recognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family. It is thus necessary to consider the use, advertisement, and distinctiveness of the marks, including assessment of the contribution of the common feature to the recognition of the marks as of common origin.

Neither the mere intention to create a family of marks, nor ownership of multiple registrations containing the family term, is sufficient in and of itself to establish that a party owns a family of marks. *Am. Standard Inc. v. Scott & Fetzer Co.*, 200 USPQ 457, 461 (TTAB 1978); *Consol. Foods Corp. v. Sherwood Med. Indus. Inc.*, 177 USPQ 279, 282 (TTAB 1973); *Witco Chem. Co. v. Chemische Werke Witten GmbH.*, 158 USPQ 157, 160 (TTAB 1968).

In order to prove ownership of a family of marks, a party must establish:

> [F]irst, that prior to the entry into the field of the opponent's mark, the marks containing the claimed 'family' feature or at least a substantial number of them, were used and promoted together by the proponent in such a manner as to create public recognition coupled with an association of common origin predicated on the 'family' feature; and second, that the 'family' feature is distinctive (i.e. not descriptive or highly suggestive or so commonly used in the trade that it cannot function as the distinguishing feature of any party's mark).

*Marion Labs. Inc. v. Biochemical/Diagnostics Inc.*, 6 USPQ2d 1215, 1218-19 (TTAB 1988) (quoting *Land-O-Nod Co. v. Paulison*, 220 USPQ 61, 65-66 (TTAB 1983)). *See also TPI Holdings*, 126 USPQ2d at 1420. Thus, Opposer must prove the existence of an ERA family of marks prior to any date Applicant can rely upon for purposes of priority. *See TPI Holdings*, 126 USPQ2d at 1419. As the Board explained in *Hester Indus. Inc. v. Tyson Foods Inc.*, 2 USPQ2d 1645, 1647 (TTAB 1987):

> [I]t is well settled that the mere ownership of a number of marks sharing a common feature (or even ownership of registrations thereof) is insufficient to establish a claim of ownership of a "family" of marks characterized by the feature in the absence of competent evidence showing that **prior to the first use by the alleged interloper**, the various marks said to constitute the "family," or at least a goodly number of them, were used and promoted together in such a manner as to create among purchasers an association of common ownership based upon the 'family' characteristic.

(Emphasis added). *See also TPI Holdings*, 126 USPQ2d at 1419-20.

The burden of proving a family of marks falls with Opposer, the party asserting the existence of the family. *See TPI Holdings Inc. v. Trailertrader.com LLC*, 126 USPQ2d 1409, 1419 (TTAB 2018).

Mr. Heimburg, Opposer's Vice President & General Manager for North America, who is responsible for Opposer's sport business units, testified that the genesis of the alleged ERA family of marks concept arose from the introduction of a new line of caps in "2012" designed to enhance athletic performance under different weather conditions:

> Opposer knows that its consumers have come to expect superior performance from its products, which inspires Opposer to continuously innovate and improve. One

> noteworthy innovation occurred in 2012, when Opposer introduced line of high performance caps focused on enhancing each athlete's experience. These caps are offered under a family of ERA marks, which includes, COOLERA (products that offer superior cooling technologies), DRYERA (products that specialize in repelling water), SOLARERA (products that offer heightened protection from ultraviolet rays), and WINTERERA (products that provide thermal guard protection in cool temperatures). Then, in 2013, Opposer introduced its DIAMOND ERA caps, which incorporate multiple advanced technologies designed to improve performance of the cap. In 2015, Opposer introduced its MICROERA products, which build on Opposer's prior technology and further incorporate anti-microbial agents to reduce odor. Attached as Exhibit A are few representative examples of the ways in which Opposer advertises its family of ERA marks and the way it displays its family of ERA marks on its caps. In addition, for years, Opposer has used various combinations of the marks in its ERA family of marks on every MLB and National Football League ("NFL") cap on "wing" visor stickers. See Exhibit A.

Heimburg Decl. ¶ 11; 50 TTABVUE 5-6, and Exhibit A (undated advertisements). In addition, Mr. Heimburg testified that Opposer has spent "many millions of dollars over the years advertising and marketing its products to ensure that consumers associate … the marks comprising the ERA family of marks solely with Opposer…" Heimburg Decl. ¶ 42; 50 TTABVUE 15.

We find that Opposer has failed to demonstrate the existence of its alleged family of marks prior to the August 23, 2012 filing date of the involved application, Applicant's constructive use date. Mr. Heimburg testified that Opposer's DIAMOND ERA branded caps and MICROERA mark for high performance athletic products were not used until 2013 and 2015, respectively, subsequent to Applicant's constructive use date. As to Opposer's remaining marks in its line of high performance caps (COOLERA, DRYERA, SOLARERA and WINTERERA), Mr.

Heimburg's testimony is vague, stating merely a "noteworthy innovation occurred in 2012." Heimburg Decl. ¶ 11; 50 TTABVUE 5-6. Nothing in his testimony references the specific date when use together and promotion of the marks in the alleged ERA family of marks commenced, let alone when the public came to associate the family surname alone with Opposer.

Hence, at best, the earliest date upon which Opposer could possibly establish the existence of its alleged family of ERA marks is December 31, 2012, which is after Applicant's constructive use date. *See Bass Pro Trademarks, LLC v. Sportsman's Warehouse, Inc.*, 89 USPQ2d 1844, 1856 (TTAB 2008) ("we conclude that respondent's date of first use can be no earlier than March 31, 1995, the last day of the specified time period identified in Mr. Utgaard's testimony"); *Osage Oil & Transp., Inc. v. Standard Oil Co.*, 226 USPQ 905, 911 n.22 (TTAB 1985) (evidence established first use in 1968-1969, therefore December 31, 1969 is date of first use); *Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*, 213 USPQ 597, 598 n.5 (TTAB 1982) (documentary evidence showed first use in 1977, the month and day were unknown, therefore, the Board could not presume any date earlier than the last day of the proved period).

Moreover, Mr. Heimburg's testimony regarding Opposer's first use of its alleged family of ERA marks is ambiguous. Thus, Opposer failed to meet its burden of establishing priority for its alleged family of marks. *See Nat'l Bank Book Co. v. Leather Crafted Prods., Inc.*, 218 USPQ 826, 828 (TTAB 1993) (oral testimony may be sufficient to prove the first use of a party's mark when it is based on personal knowledge, it is clear and convincing, and it has not be contradicted); *GAF Corp. v.*

*Anatox Analytical Servs., Inc.*, 192 USPQ 576, 577 (TTAB 1976) (oral testimony may establish prior use when the testimony is clear, consistent, convincing, and uncontradicted). *See also Exec. Coach Builder, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175 1184 (TTAB 2017) (oral testimony of a single witness with personal knowledge may establish priority, but only if it is sufficiently probative); *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1119 (TTAB 2009) ("[N]either Mr. Marier's testimony nor that of Ms. Watson clearly indicates *when* opposer began using its AGROMETER mark. The only date mentioned in connection with such use is June 4, 2007. … While the clear implication of this testimony is that opposer was using the mark at some time before that date, no such date was specified. … The subject application was filed on June 19, 2005, well prior to the earliest dates on which opposer's use of its mark has been established."); *H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d 1953, 1959 (TTAB 2008) ("Mr. Cahill's testimony is not specific enough with respect to camisoles, and it is without any corroborating documentary evidence, to persuade us that opposer used its mark ONE TRUE FIT in connection with camisoles prior to the filing date of applicant's application.").

Having determined that Opposer failed to prove prior use of a family of ERA marks, priority and likelihood of confusion must be based on each of Opposer's pleaded marks separately. *See Truescents LLC v. Ride Skin Care LLC*, 81 USPQ2d 1334, 1338 (TTAB 2006).

### B. Priority

Because, as noted above, Opposer properly made of record its valid and subsisting

pleaded registrations and Applicant did not counterclaim to cancel them, priority is not at issue for the marks and the goods and services identified in each individual registration. Opposer's Notice of Reliance, Exhibits A-1 to A-19; 53 TTABVUE 3-156. *See King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). *See also Coach Servs.*, 101 USPQ2d at 1727-28.

### C. Likelihood of Confusion

Our analysis is based on all of the probative evidence of record. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In making our determination, the Board has considered each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup Inc. v. Capital City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination").

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences

in the essential characteristics of the goods and differences in the marks."). These factors, and the other *DuPont* factors argued by each party, are discussed below.

We will focus the likelihood of confusion analysis on Opposer's typed mark NEW ERA in Registration No. 2584973 for "athletic caps" in International Class 25. *See, e.g., In re Max Capital Grp. Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010). If we find a likelihood of confusion as to that mark and those goods, we need not find it as to Opposer's other registered marks; conversely, if we do not find a likelihood of confusion as to Opposer's NEW ERA mark for "athletic caps," we would not find it as to Opposer's other registered marks for the goods identified therein.

### 1. Strength of Opposer's NEW ERA mark

In determining the strength of a mark, we consider both its inherent strength, based on the nature of the mark itself, and, if there is evidence in the record of marketplace recognition of the mark, its commercial strength. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning)."); *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 101 USPQ2d 1163, 1171-72 (TTAB 2011) (the strength of a mark is determined by assessing its inherent strength and its commercial strength); *Tea Bd. of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:83 (5th ed. June 2018 update) ("The first enquiry focuses on the inherent potential of the term at the time of its first use. The second evaluates the actual customer recognition value of the

mark at the time registration is sought or at the time the mark is asserted in litigation to prevent another's use.").

### a. Inherent or Conceptual Strength

The inherent or conceptual strength of Opposer's NEW ERA mark is not seriously at issue. Opposer's mark is inherently distinctive as evidenced by its registration on the Principal Register without a claim of acquired distinctiveness under Section 2(f) of the Trademark Act. *Tea Bd. of India*, 80 USPQ2d at 1889. Opposer's registration is "prima facie evidence of the validity of the registered mark ...." Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b). *See also Tea Bd. of India*, 80 USPQ2d at 1899. And as discussed below, we have no evidence that NEW ERA has a particular meaning in the industry and minimal evidence of registrations of marks comprised of ERA for the same or similar goods that might demonstrate the inherent weakness of the ERA component as a source identifier. Thus, on this record, Opposer's NEW ERA mark for the identified goods is conceptually strong, and as discussed below, Applicant has not shown that the mark has been weakened.

### b. Commercial Strength or Fame

Commercial strength or fame is the extent to which the relevant public recognizes a mark as denoting a single source. *Id.* Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897

(Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). Because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Coach Servs.*, 101 USPQ2d at 1720 (citing *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007)).

The commercial strength or fame of a mark is not a binary factor in the context of a likelihood of confusion analysis. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017). Rather, likelihood of confusion fame "varies along a spectrum from very strong to very weak." *See Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed Cir. 2005) (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059 (Fed. Cir. 2003)). Famous marks "enjoy wide latitude of legal protection" and are "more attractive as targets for would-be copyists." *Id.* Fame for likelihood of confusion purposes arises as long as a "significant portion of the relevant consuming public ... recognizes the mark as a source indicator." *Id.*

Commercial strength or fame may be measured indirectly by the volume of sales and advertising expenditures in connection with the goods or services sold under the mark, and supported by other indicia such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the goods or services identified by the marks; and the general reputation of the goods or services.

*Weider Publ'ns, LLC v. D & D Beauty Care Co.*, 109 USPQ2d 1347, 1354 (TTAB 2014), *appeal dismissed per stipulation*, No. 2014-1461 (Fed. Cir. Oct. 10, 2014); *see also Bose*, 63 USPQ2d at 1308 (recognizing indirect evidence as appropriate proof of strength). "[T]he proper legal standard for evaluating the fame of a mark under the fifth *DuPont* factor is the class of customers and potential customers of a product or service, and not the general public." *Joseph Phelps Vineyards*, 122 USPQ2d at 1734.

NEW ERA is Opposer's main trademark, and Opposer presented testimony and evidence[18] of annual revenue derived from the sale of NEW ERA branded caps and apparel "globally" and "across 85 different countries," (Heimburg Decl. ¶ 18; 50 TTABVUE 7) and data regarding marketing, advertising and promotional expenditures in "all of North America." *See id.* Because Opposer failed to break down sales and expenditures for the United States alone, the probative value of this evidence to prove commercial strength or fame is diminished.

Opposer did however submit other types of probative evidence to prove commercial strength or fame. Opposer's testimony and evidence discussed above[19] show that Opposer's NEW ERA mark has been used since the 1930s to identify caps and that through its relationship with major league baseball and professional football as well as other sports, U.S. consumers have been exposed to the NEW ERA branded athletic caps in a variety of ways (for example, televised coverage of major league

---

[18] Although commercial strength or fame can apply to a family of marks, *McDonald's Corp. v. McSweet, LLC*, 112 USPQ2d 1268, 1277 (TTAB 2014), the bulk of Opposer's evidence pertains solely to its NEW ERA mark in connection with caps.

[19] See section *supra* entitled "The Parties."

baseball and football games and advertisements online and in brick-and-mortar store retail outlets).

Also as explained above, Opposer's NEW ERA mark enjoys a vibrant social media following. *Cf. Chanel, Inc. v. Makarczyk*, 110 USPQ2d 2013, 2020 (TTAB 2014) (evidence of dilution fame included Opposer's social media presence on Facebook, YouTube, Twitter, Google+, Vimeo and LinkedIn). In addition, Opposer presented evidence that its NEW ERA mark has received unsolicited media recognition in publications with a national circulation such as THE NEW YORK TIMES, USA TODAY, ENTREPRENEUR and FORBES. Notice of Reliance, Ex. H-5 ("Adjusting Caps to Fit the Times," New York Times Online, posted Aug. 26, 2009, accessed on Nov. 1, 2016 at http://www.nytimes.com/2009/08/27/sports/27hats.html), 54 TTABVUE 180-188; Heimburg Decl. ¶¶ 26, 28, 30, Exhs. B-E ("New Era keeps players' heads, company's hearts in game," USA TODAY, Oct. 4, 2016 (Ex. B); "If the Chicago Cubs go all the way, New Era will too," USA TODAY, Oct. 4, 2016 (Ex. C); "How New Era Stays on Top of Consumers' Minds and on Top of Players' Heads," ENTREPRENEUR, Sept. 20, 2017 (Ex. D); "New Era's Sales Surge in First Year of NFL Contract," FORBES, Feb. 2, 2013 (Ex. E); 50 TTABVUE 15-18; 25-44.

Opposer also testified that it aggressively protects its NEW ERA brand name through enforcement actions. Heimburg Decl. ¶¶ 43-46, 50 TTABVUE 15-18. Opposer has been the plaintiff in over 30 Board inter partes proceedings involving ERA formative marks. *See* Opposer's Rebuttal Notice of Reliance, Exhs. M-1 to M-19; 71 TTABVUE 776-1175; *see also* Applicant's Notice of Reliance, Exhs. B-1 to B-30; 68

TTABVUE 38-57 and 69 TTABVUE 2-131 and Trademark Rule 2.122(a), 37 C.F.R. § 2.122(a) ("When evidence has been made of record by one party in accordance with these rules, it may be referred to by any party for any purpose permitted by the Federal Rules of Evidence.").

Applicant counters that Opposer's NEW ERA mark cannot be deemed commercially strong because Opposer has not provided a consumer survey to substantiate this finding. There is no requirement, however, that a party must submit evidence of this nature to prove fame or commercial strength. As explained in *Bose, supra*:

> Direct evidence of fame, for example from widespread consumer polls, rarely appears in contests over likelihood of confusion.
>
> …
>
> As to the absence of any consumer surveys, we note that a footnote to the Board's own statement recognizes that direct evidence, such as surveys, is not "required in order to determine whether a mark is famous." Indeed, as noted above, virtually all of our precedent attributing fame to a mark has done so through indirect evidence of the extent to which a mark has earned fame in the consumer marketplace.

*Bose Corp.*, 63 USPQ2d at 1308.

In sum, we find that Opposer has established that its pleaded registered NEW ERA mark used in connection with athletic caps marks falls on the much higher end of the commercial strength spectrum "from very strong to very weak," *Joseph Phelps Vineyards*, 122 USPQ2d at 1734, amongst a "significant portion of the relevant U.S. consumers," *Palm Bay*, 73 USPQ2d at 1694. This *DuPont* factor weighs in favor of

finding a likelihood of confusion.

2. The Number and Nature of Similar Marks in Use on Similar Goods

Applicant argues that the term ERA is entitled to only a narrow scope of protection because "of the [n]umber of [t]hird-[p]arty 'ERA' marks in [u]se in [c]onnection with [s]imilar [g]oods." However, Applicant did not provide evidence of any third-party use of marks consisting of or comprised of the term ERA for these goods, and thus no evidence of commercial weakness. *See Palm Bay*, 73 USPQ2d at 1693 ("Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection."); *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1059 (TTAB 2017) ("As to *commercial* weakness, 'the probative value of third-party trademarks depends entirely upon their usage'") (quoting *Palm Bay*, 73 USPQ2d at 1693).

Instead, Applicant relies on 22 third-party registrations for International Class 25 goods that include the word ERA in their marks. Third-party registrations alone may be relevant, in the manner of dictionary definitions, "to prove that some segment of the [marks] has a normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1675 (Fed. Cir. 2015) (internal quotation marks omitted). *See also Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015). In addition, "in determining the degree of weakness, if any, in the shared terms, we must 'adequately account for the apparent force of [third-party use and registration] evidence,' regardless of whether

'specifics' pertaining to the extent and impact of such use have been proven." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd mem.*, 777 F. App'x (Fed. Cir. 2019).

As Opposer correctly points out, however, 19 of those registrations have been either cancelled or have expired. Such registrations have little or no probative value. "The existence of a cancelled registration—particularly one cancelled for failure to provide a declaration of continued use—does not tend to show that the cited mark is weak due to third-party use." *In re Inn at St. John's,* 126 USPQ2d at 1745. The three remaining third-party registrations are the following:

> GOLDEN ERA (Reg. No. 4,350,431) for "Shirts and short-sleeved shirts; T-shirts," owned by Massive Holdings, LLC
>
> TRIAL & ERA CLOTHING & Design (Reg. No. 4,802,978) for "Apparel, namely, t-shirts, sweatshirts, pants, coats, lightweight jackets and socks," owned by Austin Palmer; and
>
> P.R.E.P. PROGRESS. RESPECT. EMPOWERMENT. PROSPERITY. ERA & Design (Reg. No. 4,453,961) for "Crew neck sweaters; Headwear; Hooded pullovers; Hooded sweatshirts; Short-sleeved or long-sleeved t-shirts; Sweaters; T-shirts," owned by multiple individuals.

Applicant's Notice of Reliance, Ex. A. Only one of the third-party registered marks, GOLDEN ERA, is similar in structure to Opposer's NEW ERA mark. In any event, three third-party registrations, coupled with the lack of evidence of third-party use, falls short of the "voluminous" evidence that would establish that ERA is so commonly registered in connection with athletic caps or other clothing products that it is a conceptually weak term. *See Juice Generation*, 115 USPQ2d at 1673; *Jack Wolfskin*, 116 USPQ2d at 1136 (discussing "voluminous evidence" of registration and use of

paw print design elements). *See also Inn at St. John's*, 126 USPQ2d at 1746 (where applicant presented no evidence of third-party use, and at most, four third-party registrations of varying probative value, including "two for non-identical terms," found to be "a far cry from the large quantum of evidence of third-party use and third-party registrations that was held to be significant in both" *Jack Wolfskin* and *Juice Generation*).

Thus, based on the record before us, this *DuPont* factor regarding the number and nature of similar marks in use on similar goods is neutral.

In summary, because Opposer's NEW ERA mark for the identified goods is conceptually strong and falls on the higher end of the fame or commercial strength spectrum "from very strong to very weak," we find that Opposer's NEW ERA mark is a strong mark entitled to a broad scope of protection.

3. The Similarity or Dissimilarity of the Goods and the Established, Likely-to-Continue Channels of Trade and Classes of Consumers

Next, we compare the goods as they are identified in the involved application and Opposer's registration. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) and *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002). The application includes "caps." Because it is unrestricted, "caps" encompasses all types of caps, including the "athletic caps" identified in Opposer's Registration No. 2584973. *See, e.g.*, *In re Hughes Furniture Indus., Inc.*, 114 USPQ2d 1134, 1137 (TTAB 2015) ("Applicant's broadly worded identification of 'furniture' necessarily

encompasses Registrant's narrowly identified 'residential and commercial furniture.'"). Thus, on their face, Applicant's and Opposer's goods are in-part legally identical.[20]

Because the goods are in-part identical and unrestricted as to trade channels, we must also presume that these particular goods travel in the same ordinary trade and distribution channels and will be marketed to the same potential consumers. *See In re Viterra Inc.*, 101 USPQ2d at 1908 (even though there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion); *In re Yawata Iron & Steel Co.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968) (where there are legally identical goods, the channels of trade and classes of purchasers are considered to be the same); *Am. Lebanese Syrian Associated Charities Inc. v. Child Health Research Inst.*, 101 USPQ2d 1022, 1028 (TTAB 2011). These *DuPont* factors weigh in favor of finding a likelihood of confusion.

### 4. The Similarity or Dissimilarity of the Marks

This *DuPont* factor involves an analysis of the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay*, 73 USPQ2d at 1691 (quoting *DuPont*, 177 USPQ at 577). "The proper test is not a side-by-side comparison of the marks, but instead 'whether

---

[20] "[I]t is sufficient for finding a likelihood of confusion if relatedness is established for any item encompassed by the identification of goods within a particular class in the application." *In re Aquamar, Inc.*, 115 USPQ2d 1122, 1126 n.5 (TTAB 2015) (citing *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981)). *See also In re i.am.symbolic, LLC*, 116 USPQ2d 1406, 1409 (TTAB 2015), *aff'd*, 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017).

the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs.*, 101 USPQ2d at 1721 (quoting *Leading Jewelers Guild, Inc. v. LJOW Holdings, LLC*, 82 USPQ2d 1901, 1905 (TTAB 2007)). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *In re Binion*, 93 USPQ2d 1531, 1534 (TTAB 2009) (citing *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975)). In this case, because the goods at issue are, inter alia, athletic caps and caps, the average purchaser is an ordinary consumer.

Our analysis cannot be predicated on dissection of the involved marks. *See Stone Lion*, 110 USPQ2d at 1161. Rather, we are obliged to consider the marks in their entireties. *Id. See also Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion."). Nonetheless, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *Stone Lion*, 110 USPQ2d at 1161.

Also as noted above, the in-part identity of Applicant's and Opposer's goods reduces the degree of similarity between the marks necessary to find a likelihood of confusion. *In re Viterra*, 101 USPQ2d at 1908; *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed. Cir. 2010); *In re Max Capital Grp. Ltd.*, 93 USPQ2d at

1248.

Applicant argues that Opposer's NEW ERA mark is different in appearance, sound, connotation and commercial impression due to the inclusion of the word "PRO" in Applicant's PRO ERA mark. Applicant presented testimony that the name "Pro Era" is an abbreviation for "Progressive Era," (*Id.* at ¶ 4; 66 TTABVUE 3), suggesting that consumers of its products are more likely to recognize the mark as a shortened version of the hip hop collective's name. However, "[t]he derivation of a mark is of no particular significance if the end result is a mark confusingly similar to a previously registered mark." *In re Iowa Paint Mfg. Co.*, 149 USPQ 230, 231 (TTAB 1966) (citing *Meyer Chem. Co. v. Anahist Co.*, 263 F.2d 344, 120 USPQ 483, 484 (CCPA 1959) ("How the mark came to be adopted is not material to the issue.")). *See also Dap, Inc. v. Litton Indus., Inc.*, 185 USPQ 177, 178 n.2 (TTAB 1975) ("Apart from the fact that there is nothing to suggest that purchasers of applicant's goods are aware of the derivation of its "DAP" mark, the genesis of a mark is of no particular significance if the result is a mark which, as used, conflicts with the prior use and/or registration of the same or a similar mark by another."). The record is devoid of evidence that consumers are likely to perceive "PRO" as it appears in Applicant's mark as an abbreviation for "progressive," as opposed to another term such as "professional." The word PRO, as Applicant acknowledges, could be perceived as an abbreviation for "professional." Applicant's Brief, p. 15; 79 TTABVUE 10.[21] *See BAF*

---

[21] "Pro" may be defined as "paid to participate in a sport or activity" and "PROFESSIONAL <pro athletes> <He sank the putt like a pro>." Opposer's Notice of Reliance Ex. B-3 (THE MERRIAM-WEBSTER DICTIONARY); 53 TTABVUE 182, 186.

*Industries v. Pro Specialties, Inc.*, 206 USPQ 166, 175 (TTAB 1980) ("[T]he word 'PRO' has a laudatory connotation as applied to most products and services indicating that they are utilized by professionals or are of professional quality."). We acknowledge the differences in the marks pointed out by Applicant. We also recognize that consumers are often inclined to focus on the first part of a trademark. *See Palm Bay*, 73 USPQ2d at 1692. That being said, both marks are similar in structure, consisting of two words, commencing with a three-letter monosyllabic term and ending with the term ERA. In the context of the clothing such as the caps and hats identified in the application, consumers may perceive PRO as indicative of the level of quality and the intended use of the goods, i.e., superior quality suitable for use by professional athletes. A highly suggestive term of this type is less likely to form a strong impression amongst prospective consumers seeking to distinguish similar marks. *See Stone Lion*, 110 USPQ2d at 1161 ("Nor did the Board err by according little weight to the adjective 'STONE,' on the ground that it did not 'distinguish the marks in the context of the parties' services.'"). Also, given the relative commercial strength of Opposer's NEW ERA mark, consumers are likely to perceive hats and caps sold under Applicant's PRO ERA mark as an extension of Opposer's NEW ERA athletic cap product line.

Although the marks have the noted differences, when we compare them in their entireties, we find that overall they are similar in appearance, sound, connotation and overall commercial impression. Accordingly, this *DuPont* factor weighs in favor

of finding a likelihood of confusion.

### 5.  Purchasing Conditions

We now consider the conditions under which the goods are likely to be purchased, e.g., whether on impulse or after careful consideration, as well as the degree, if any, of sophistication of the consumers. A heightened degree of care when making a purchasing decision may tend to minimize likelihood of confusion. Conversely, impulse purchases of inexpensive items may tend to have the opposite effect. *Palm Bay*, 73 USPQ2d at 1695.

Applicant argues that the "focused needs" of Applicant's and Opposer's intended consumers are distinct and divergent. *See G.H. Mumm & Cie v. Desnoes & Geddes, Ltd.*, 917 F.2d 1292, 16 USPQ2d 1635, 1638 (Fed. Cir. 1990) (determining that when consumers enter the marketplace with a "focused need," confusion between goods or services is less likely). As Applicant contends,

> Applicant's apparel merchandise is ancillary to its efforts in recorded music and live shows and therefore consumers who purchase products identified by Applicant's PRO ERA mark will make very deliberate selection decisions because they are seeking these goods to show that they are a fan of Pro Era (vs. another band or musical group or performer). Similarly, consumers who purchase products identified by Opposer's NEW ERA and ERA marks will also make very deliberate selection decisions because they are seeking these goods to show that they are a fan of the New York Yankees, the Boston Celtics, Pearl Jam, or another other professional sports teams or music performers with whom it specifically collaborates.

Applicant's Brief, p. 16; 79 TTABVUE 21.

Contrary to Applicant's assertions, the Board may not read limitations into Opposer's unrestricted registration or Applicant's application, nor may the Board

resort to the use of extrinsic evidence to restrict the channels of trade. *See SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 216 USPQ 937, 940 (Fed. Cir. 1983) ("There is no specific limitation here, and nothing in the inherent nature of SquirtCo's mark or goods that restricts the usage of SQUIRT for balloons to promotion of soft drinks. The board, thus, improperly read limitations into the registration."); *In re Bercut-Vandervoort & Co.*, 229 USPQ 763, 764 (TTAB 1986) (evidence that relevant goods are expensive wines sold to discriminating purchasers must be disregarded given the absence of any such restrictions in the application or registration). Neither Opposer's Registration No. 2584973 nor Applicant's application reflects any restrictions as to classes of purchasers or type of cap. It is therefore presumed that Applicant's "caps" and Opposer's "athletic caps" are offered to all the normal potential consumers, which would include not only fans of Applicant's music or other music fans and sports enthusiasts but all members of the general public. *Octocom*, 16 USPQ2d at 1787; *cf. In re i.am.symbolic, LLC*, 866 F.3d 1315, 123 USPQ2d 1744, 1749-50 (Fed. Cir. 2017) (goods and channels of trade held to be identical or closely related notwithstanding language in applicant's identifications that its goods were "associated with William Adams, professionally known as 'will.i.am'"). Thus, while purchasers of Applicant's caps may be motivated to buy the caps to show their enthusiasm for Applicant's hip hop collective while consumers of Opposer's athletic caps are seeking to demonstrate their allegiance to a particular sports team, given the lack of restrictions in the application and registration, Applicant's "focused needs" argument necessarily fails.

In addition, the identifications in the application and Opposer's registration include "caps" and "athletic caps" at no specified price point. We must assume that the products are sold at all price points and to all types of buyers and overlap to include both the discriminating purchaser as well as the ordinary bargain hunter. Ordinary consumers of headwear and clothing are likely to exercise only ordinary care, and given the lack of price restrictions in the identifications, they may even buy inexpensive items on impulse. *See Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000) ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care."). Our assumptions based on the lack of price restrictions in the identifications are buttressed by additional evidence in the record. Opposer testified that except for the occasional "special, limited edition products with unique embellishments," its caps are "reasonably priced," selling in the $10.00 to $35.00 range. Heimburg Decl. ¶¶ 38-39; 50 TTABVUE 14.

Accordingly, this factor is neutral.

6. Actual Confusion and Contemporaneous Use

Applicant argues that the absence of evidence relative to instances of actual confusion weighs against a finding of likelihood of confusion. As Applicant contends, although it filed its application for International Class 25 as intent-to-use, in fact Applicant began offering certain apparel items online and at events in which it performs shortly after Applicant's legal formation. Applicant points to

contemporaneous use of Opposer and Applicant's respective marks concurrently in commerce for approximately eight (8) years.

The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by Applicant of its mark for a significant period of time in the same markets as those served by Opposer under its mark. *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1645, 1660 (TTAB 2010), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011); *Gillette Canada Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). In other words, for the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred. *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the absence of actual confusion depends upon there being a significant opportunity for actual confusion to have occurred); *Red Carpet Corp. v. Johnstown Am. Enters. Inc.*, 7 USPQ2d 1404, 1406-07 (TTAB 1988); *Central Soya Co. v. North Am. Plant Breeder*s, 212 USPQ 37, 48 (TTAB 1981) ("the absence of actual confusion over a reasonable period of time might well suggest that the likelihood of confusion is only a remote possibility with little probability of occurring").

As noted above, our analysis as to the second and third *DuPont* factors, discussing the similarity or dissimilarity of the goods and channels of trade, is based, as dictated by precedent from the Federal Circuit, on the identifications **as set forth** in the application and the cited registration. *See Stone Lion*, 110 USPQ2d at 1162. As such,

when determining those factors, we may not consider evidence of how Applicant and Registrant are **actually selling** their goods in the marketplace. *Id.*

This eighth *DuPont* factor, by contrast, requires us to look at **actual market conditions**, to the extent there is evidence of such conditions of record. *In re Guild Mortg. Co.*, 2020 USPQ2d 10279, 2020 BL 120829 (TTAB 2020) (emphasis in original). Any lengthy absence of actual confusion during a period of known, rather than legally presumed, use in the same channels of trade could be telling. In this regard, we consider all of the evidence of record that may be relevant to the eighth *DuPont* factor.

Applicant testified that its International Class 25 goods are collateral to its Class 41 music services, explaining that Applicant expanded its merchandise revenue stream to clothing "because of touring and its fans," selling apparel at concerts and on its website (www.theproera.com), on Shopify (www.shopify.com) and on a variety of social media platforms such as Twitter, Facebook, and Instagram. Kimbah Virgine Decl. ¶¶ 9-12; 66 TTABVUE 4 and Jo-Vaughn Virgine Decl. ¶¶ 12-13; 67 TTABVUE 4. Applicant estimates its "total amount of sales" on Shopify of "caps and T-shirts and hoodies" and other apparel items at approximately $200,000.00. Opposer's Notice of Reliance, Rule 30(b)(6) Discovery Deposition of Jo-Vaughn Virgine, 17:15-18:25; 53 TTABVUE 523-524. Applicant's musical services have garnered a substantial amount of consumer attention. *See* Jo-Vaughn Virgine Decl. ¶¶ 5-8; 67 TTABVUE 3-4 (Applicant's SoundCloud page currently has 1.79 million subscriber follower

subscriptions; Applicant's YouTube channel/page had 209 music videos; 654,000 subscribers; and a combined 273,065,711 total music video views at time of trial).

Opposer also enjoys a strong social media presence, collaborates with music artists, and sponsors acts at music festivals where it markets limited editions of its caps. Heimburg Decl. ¶¶ 8, 9; 50 TTABVUE 4-5 and Capobianco Decl. ¶ 6; 52 TTABVUE 6. According to the record, Opposer and Applicant have both been involved in the SXSW Music Festival. Opposer hosts a gifting suite (caps and clothing) for artists and celebrities, and also distributes limited edition caps created specifically for the event. Opposer's Notice of Reliance, Ex. K-2 (confidential), 49 TTABVUE. Applicant has performed at the SXSW Music Festival. Opposer's Notice of Reliance, Rule 30(b)(6) Discovery Deposition of Jo-Vaughn Virgine 32:8-33:3 (Opposer sponsored SWSW Music Festival where Applicant performed); 53 TTABVUE 523-538.

We cannot discern the extent to which Applicant's use of its PRO ERA mark in connection with its identified Class 25 goods has been "appreciable" or "continuous" without a context for the numbers. On the record before us, the fact that both parties have a presence on the same social media sites and at the same music festival, standing alone does not constitute a sufficient level of evidence to evaluate the extent of Applicant's use of its PRO ERA mark in connection with "caps" or other apparel items. In addition, as noted above, there is evidence in the record that at least Opposer's products are relatively inexpensive. Also the record is devoid of evidence that consumers perceive Opposer's or Applicant's goods to be of inferior quality. This

makes it less likely consumers and potential consumers will report any instances of confusion.

Accordingly, this factor is neutral.

7. Balancing the Factors

Opposer's NEW ERA mark for athletic caps is conceptually strong and enjoys a relatively high degree of fame or commercial strength amongst the target consumers for such goods. Overall, it is similar in sound, appearance, connotation and commercial impression when compared with Applicant's PRO ERA mark. The in-part identity of Applicant's and Opposer's goods and their overlapping channels of trade and classes of purchasers not only weigh heavily in favor of a finding of likelihood of confusion, but also reduce the degree of similarity between the marks necessary to find a likelihood of confusion. Weighing these factors, we find confusion likely. In reaching this conclusion, we have carefully considered all of the evidence pertaining to the relevant *DuPont* factors, as well as all of the parties' arguments with respect thereto.

Accordingly, we find that Opposer has proved its standing, priority, and likelihood of confusion by a preponderance of the evidence.

Decision: Opposer's Section 2(d) claim is sustained as to the International Class 25 goods. Applicant's application will move forward as to Applicant's International Class 41 services only.